### MORRIN v. ROBERT WHITE ENGINEERING WORKS.

#### (Circuit Court, E. D. New York.   May 10, 1905.)

1. PATENTS—INFRINGEMENT—RECONSTRUCTION OR REPAIR.

   The rule as to the right of a purchaser of a patented combination to supply parts, of his own authority, from a generalization of the authorities, would seem to be that he may replace an element of the combination (1) when its consumption was the very purpose of the device; (2) when its use upon external objects must work its early destruction; (3) when it was intended to be destroyed and was destroyed after a single use, and became waste material; (4) when, in the arrangement of an element, not the chief element, it is so fashioned and placed as to be specially subjected to external forces that make it peculiarly liable to breakage and wear; (5) when it is not the chief part of the combination; (6) when it is an ordinary working part, like a cam in actuating machinery, although specially adapted for the proper operation of the device, and even though it is the most essential element in the combination. But an element may not be replaced when it is the vital element of the combination in fact, and in regard to patentability, especially when it is not intended to be of short life by the action of external forces thereon.

   [Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, § 399.]

2. SAME—RECONSTRUCTION OF VITAL ELEMENT OF COMBINATION.

   Complainant was the owner of a patent for a steam generator, consisting of an upright cylinder or shell provided with tiers of generating

tubes, of peculiar shape, which constituted the vital and patentable element of the structure. Such tubes constituted about one-third in value of the completed structure, and were ordinarily subject to injury only from the action of the water, the same as the shell, though perhaps to a greater extent. Defendant, under contracts with purchasers of the patented generators, practically refitted the same with new tubes; some of the old ones having become useless. *Held*, that such refitting was not an authorized repairing of the patented structure, but a reconstruction, which constituted an infringement of the patent.

3. SAME—STEAM GENERATOR.

The Morrin patent, No. 463,307, for a steam generator, *held* infringed by defendant by a reconstruction of the tubes, which constitute the patentable element of the combination, in generators which had been sold under license from the patentee.

In Equity. Suit for infringement of patent.

Joseph F. Farmer (George E. Morse, Clifford E. Dunn, and Henry M. Turk, of counsel), for complainant.

Field & Chittenden (Thomas Ewing, Jr., of counsel), for defendant.

THOMAS, District Judge. The complainant is the owner of letters patent No. 463,307, issued to Thomas F. Morrin on November 17, 1891. The bill charges that the defendant has infringed claim 2, which is as follows:

"(2) A steam-generator having an upright generator-cylinder provided with tiers of generating-tubes, b, of loop-like form, said loop having a pear-shaped outline when seen in plan, and each loop having at one side a lobe formed by the short out-curve at bx, and the short in-curve at bxx, the planes of the loops in the tubes being set obliquely to the axis of the generator-cylinder, substantially as set forth."

This claim was sustained in the suit of Morrin v. Lawlor and Morrin v. Edison Electric Illuminating Co. (C. C.) 90 Fed. 285, on appeal 99 Fed. 977, 40 C. C. A. 204. The patentability of the structure, as shown in the claim, is found in the loop described in claim 2, and it was so held. The Clonbrock Steam Boiler Company, a former licensee of the complainant, installed at the establishment of the Terre Haute Electric Company between December, 1894, and July, 1895, two boilers constructed pursuant to the claim, and two of the same type of boilers at the establishment of the American Manufacturing Company—one in 1895 and one in 1898. On April 8, 1904, a receiver of the Clonbrock Company was appointed in bankruptcy, and thereupon one Jones, who had been the vice president of such company, canceled a contract which he had made on December 29, 1903, with the Terre Haute Company, whereby he was to supply for its boilers the following:

950, 3" Boiler Tubes for 500 H. P. Climax Boilers at 3.50 each.
1000 ½x1" Bolts at 1½c. each.
50 Casing Brick for lining Casing at 15c. each.

On March 3, 1904, Jones left the Clonbrock Company, and on March 16th procured the Terre Haute Company to give the contract for the work to the defendant. Pursuant to its contract the

defendant replaced in each boiler at Terre Haute 450 tubes, which was 25 less for each cylinder than the amount originally provided; the cylinder at some previous time having been so repaired as to prevent further replacement. The defendant calked part of the shell of one of the boilers, and put in new bricks in an outer casing where necessary, and furnished 1,000 bolts. The defendant actually sent to the Terre Haute Company 950 new tubes. The American Manufacturing Company negotiated with both the defendant and the receiver of the Clonbrock Company for work upon its boilers. On July 5, 1904, that company requested the receiver to estimate on the cost of furnishing from 900 to 1,000 tubes and other parts, and on July 17th the receiver agreed to do the work at $4.75 per tube, which included the cost of the tube and labor. On June 20, 1904, the defendant offered to supply 475 tubes for one of the American Manufacturing Company's boilers, and 588 tubes for the other, at the cost of $3.25 each, and an additional sum of $400 for labor on one boiler, and $600 for the other boiler, which offer was repeated on July 20, 1904, and thereafter was accepted by the American Manufacturing Company. In addition to the above work the defendant also renewed about 4 tiers out of 19 for the Wurster & Company boiler, when it was enjoined and stopped. The boiler was taken down, moved, and put up again. The defendant did the work for these three several companies according to the contract, although the receiver gave due notice that he contested the legality of its proposed action.

The first question is whether the practical replacement of all the tubes by the defendant was unlawful renewal or authorized repair? The defendant's brief states that, as to the Terre Haute boilers, the reason for replacing the tubes was "that there were already many stop tubes and tubes in bad condition, and it was difficult to pick out the good tubes, since they were only 3-inch tubes, and bent or bowed so that one could not see inside of them"; and, as to the American Manufacturing Company boilers, that "there were two boilers that were retubed by the defendant. This was done because many of the tubes were in bad condition, and it seemed cheaper to replace all than to undertake to pick out the bad tubes." The "generator cylinder," of the 500 horse power class, is about 28 feet in height, and about 3½ feet in diameter. The original cost of the cylinder alone was about the same as that of the tubes. There was an outer casing, not mentioned in claim 2, which, with its fire-brick lining and fire box, cost about the same as each of such elements. The price of the tubes used to retube the boilers was about one-third of the original first cost of the entire structure, including cylinder, tubes, and outer casing. The evidence of Ormond, who did the work on the Terre Haute boilers for the defendant, is to the effect that the life of such a boiler is "about fourteen years; that is, if the boilers are kept repaired with tubes if they need it."

"Q. When you left these boilers at the Terre Haute Company, did you, or did you not, consider them as good as new? A. I did not consider them as

good as new. Q. Could you give any estimate as to how long they would probably run? A. Well, about two years I would give them."

Wilson, complainant's witness, states:

"Twenty years should be the lifetime of any shell boiler under certain conditions. Q. And those conditions are conditions of proper attention? A. Well, in a building of this character, I shouldn't feel justified in running boilers over twenty years, whereas, in an isolated factory, or something of that kind, with good care, a boiler would last twenty-five or thirty years. The question of crystallization creeps in, and you can't determine."

The life of the cylinder and tubes is affected by the water used in them. The Terre Haute tubes were from the beginning peculiarly clogged, impaired, and destroyed by the use of water having a large amount of carbonates and deposits, which necessitated an unusually large replacement of tubes. The American Company's boilers were used under more favorable, and perhaps ordinarily favorable, conditions, and were not fully retubed until the defendant supplied tubes therefor, although tubes failed from time to time; and in such instances the holes in the boiler were closed by stop tubes, or new tubes furnished by the Clonbrock Company were inserted, amounting in all to 50 or 60. Only a very limited number of stop tubes could be used, or the efficiency of the boiler would be seriously limited. The evidence shows that the life of a whole set of tubes is somewhat shorter than that of the cylinder, and that some of the entire set of tubes fail from time to time before the entire set becomes unserviceable.

The question to be determined requires an examination of the decisions, for the difficulty is not in discovering the general rule, but, rather, its application. Hence what the courts have regarded as reconstruction, and what justifiable repair, aids decision, and the pertinent cases must be considered carefully.

In Thomson-Houston Electric Co. v. Kelsey Electric Ry. Specialty Co., 75 Fed. 1005, 22 C. C. A. 1, the Circuit Court of Appeals modified the order of the Circuit Court (72 Fed. 1016) enjoining the defendant from selling "trolley stands." A trolley stand is the means by which the trailing arm carried above a trolley car "is hinged and pivoted to the car, with a capacity for lateral and vertical movement, and is pressed upward by some suitable spring." It held that such stands might be sold only to persons licensed to use the patented combination, of which the trolley stand was an element. Judge Townsend, in the Circuit Court, said, "The trolley stand is probably the most substantial, if not the chief, element in the patented combination." Judge Shipman, in the opinion on appeal, in which Judge Lacombe concurred, said, "But the trolley stand is not the vital element of the invention," while Judge Wallace dissented upon the ground that the defendant was entitled to sell to any person the trolley stand, although it was one part of the patented combination. This decision is to the effect that an element held not to be the vital element of a combination can be sold only to persons entitled to use the combination. What would have been the holding had the trolley stand been the vital element?

Judge Townsend, while regarding the trolley stand as "probably the most substantial, if not the chief, element," said:

"The advertisements thereof contained no limitation to sales for repairs, or to persons having the right to use said invention, and it may fairly be inferred from the affidavits that sales have been made to persons not having such right. * * * Defendants further suggest that their trolley stand is capable of a lawful as well as an unlawful use, by way of reparation or restoration of a patented device, and that the presumption must be that this is the purpose for which it is to be used. As already shown, it does not appear, by advertisements or sales, that its use is to be confined to such purpose. Inasmuch as the defendants make and thus sell stands which are useful only for the purpose of performing functions involved in the operation of the patent, it raises a presumption that they intend their stands should be so used. A suit for infringement cannot be defeated by merely showing that such devices could be used for some other purposes. Walk. Pat. (3d Ed.) 331."

But in the suit at bar the sale was made to persons licensed to use the combination, and to no others. Therefore the decision of Judge Townsend does not relate to facts such as are here presented. But Judge Shipman states (75 Fed. 1009, 22 C. C. A. 5):

"While it is not intended that a trolley stand should be broken or should lose its useful capacity, either calamity may befall it; and the right to replace the injured part by a new stand, from any person who can supply the article, should be conceded by the owners of the patent."

But he immediately adds:

"It is not intended to permit the unauthorized substitution of the vital and distinctively new part of an invention in place of one worn out by use, as the substitution of a new filament in an Edison incandescent lamp, or the substitution of a new for an old burner in the Wallace Case, supra [9 Blatchf. 65, Fed. Cas. No. 17,100]; but the trolley stand is not the vital element of the invention, though a portion of it is an element of the combination."

But in the suit at bar the tubes are the vital element of the invention. The cylinder might feebly operate without the tubes, but would be useless for any valuable purpose. The specification states:

"The water circulates through the generating-tubes, b [the tubes marked "b" are thus below the water line], flowing upward, and is converted into steam in its passage through said tubes. The saturated steam is dried in its passage upward to the steam-dome, e, through the tiers of tubes, b', [b'' are the tubes above the water line]."

And after describing the arrangement of the tubes continues:

"This arrangement of the tubes compels every portion of the ascending heated gases to come in contact with some portion of some one or more of the generating tubes."

In Davis Electrical Works v. Edison Electric Light Co., 60 Fed. 276, 8 C. C. A. 615, the claim was for "the combination of carbon filaments with a receiver made entirely of glass, and conductors passing through the glass, and from which receiver the air is exhausted, for the purposes set forth." The court held that "the carbon filament, in use in a vacuum, represents the entire advance from the state of the art." The receiver was punctured, the carbon filament destroyed by use was removed, and a new filament inserted, with its ends inserted in platinum sleeves, the hole closed

by fusion, and the air exhausted. The court held that the filament was essentially Edison's electric lamp, and that the "globe and the conductors * * * only the chimney, the stand, and the opening for inserting the oil or other fluid, found in the ordinary domestic lamp." The defendant was held to infringe. This decision seems to be to the effect that, when that element which alone gives the combination patentability is replaced, it is renewal, and not repair. Judge Colt, while considering this Edison lamp in the Circuit Court (58 Fed. 878), said:

"When you take an Edison lamp with its filament destroyed, and break open the all-glass chamber, you have only left the broken pieces—the remains—of the original lamp. Its identity as a structure is gone."

If this be the rule of "identity," the Morrin steam generator loses its identity when the tubes are removed, because it leaves a thing not only useless in fact, but also stripped of the element that makes it patentable.

A case wholly contrasting with either of the above is Pacific Steam Whaling Co. v. Alaska Packers' Association, 100 Fed. 462, 40 C. C. A. 494, where the owners of a machine for automatically filling cans removed all the parts except the legs, and on such old legs placed a new superstructure. This was obvious renewal.

In Singer Manufacturing Co. v. Springfield Foundry Co. (C. C.) 34 Fed. 393, the defendant company made some, but not all, the parts of the patented combination for improvements in sewing machines. Such parts were the feed-cam, forked connecting feed-bar, feed-lifting rock-shaft, feed rock-shaft, shuttle-driver, and shuttle-race, and they were made and sold for the purpose of replacing parts which had been broken or worn out in organized sewing machines sold by the plaintiff. It appeared that the parts would fit no other machine than that of the plaintiff without considerable alteration. Judge Colt refers to Wilson v. Simpson, 9 How. 109, 13 L. Ed. 66, which related to replaced cutter knives; Chaffee v. Belting Co., 22 How. 217, 16 L. Ed. 240, where the defendant "had used certain machinery, constructed in conformity with the specifications of the plaintiff's patent," and where the question was whether the defendant, as grantee or assignee, was licensed to use the thing patented, there being present no question of restoration or repair; to Gottfried v. Brewing Co. (C. C.) 8 Fed. 322, which will be later noticed; and Aiken v. Printworks, 2 Cliff. 435, Fed. Cas. No. 113, where the needles renewed by defendant were subject to a separate patent. Thereupon he said:

"As illustrated by these cases, the rule seems to be that where a patent covers, as an entirety, a machine composed of several separate and distinct parts, the purchaser of such machine from the patentee will not infringe by replacing such temporary parts as wear out, so long as the identity of the machine is retained; but, if the patent is for a distinct part or element of the machine, a purchaser will infringe by replacing such part or element. Tested by this rule, I think the defendants are guilty of infringement in the present case. The sewing machine of complainant is not patented as an entirety, but different parts of the machine are covered by different patents. Claims 1 and 2 of patent No. 229,629 cover an improved shuttle-driver, and the defendant makes and sells the same device to be used in a Singer machine.

The second claim of letters patent No. 274,359 is for a shuttle-race for an oscillating shuttle, provided with an elastic side or flange. The shuttle-race cannot be used in the Singer I M machine without the elastic flange. The defendant makes the shuttle-race for use in such machine. He therefore makes the major part of the patented combination, intending that it should be provided with an elastic flange, and used in complainant's machine. Claims 3 and 4 of patent No. 229,629 and claim 6 of patent 208,838 are combination claims. The main elements found in these patented combinations are made and sold by defendant for use in the Singer machine. Under the authority of Wilson v. Simpson and other cases, this cannot be done."

It is understood from the above that Judge Colt held that the shuttle-driver was subject to separate patent; that the shuttle-race, provided with an elastic side or flange, was subject to separate patent, and that the defendant made such shuttle-race usable only in the plaintiff's machine; and that the other parts sold by defendant were "main elements" in patented combinations—and thereupon ordered a decree for the complainant. From this decision it appears that the owner of the machine may not replace broken or worn-out parts that are subject to a patent, either separately, or, if they be main parts, although not the main parts in the combination, and that the parts worn or broken did not bear to the structure the relation of the knives to the planing machine in Wilson v. Simpson. There it was said that the right to replace the knives did not depend upon perishable material, but existed because the inventor's arrangement of the knives in the combination patented precluded continued use of the machine "without a succession of knives at short intervals." Then the court contrasts the other parts of the planing machine with the knives:

"The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced. These, without having a definite duration, are contemplated by the inventor to last so long as the materials of which they are formed can hold together in use in such a combination. No replacement of them at intermediate intervals is meant or is necessary. They may be repaired as the use may require. With such intentions they are put into the structure. So it is understood by the purchaser, and beyond the duration of them a purchaser of the machine has not a longer use of them. But if another constituent part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain, if he sells the use of his machine, that the purchaser uses it in the way the inventor meant it to be used, and in the only way in which the machine can be used. Such a replacement of temporary parts does not alter the identity of the machine, but preserves it, though there may not be in it every part of its original material."

Here the court draws a distinction between parts exposed to wear in connection with extrinsic material subjected to the operation of the machine, and consumed thereby after brief use, and parts that wear from coaction with other parts of the machine, or from the effect of the operation of the entire organism. But even as to the parts last mentioned, it is said that repair may be had, which leaves the question of what would be repair to be settled as each case arises.

In the suit at bar the tubes are so arranged as to be more directly affected by the heat than the adjoining cylinder. As a whole they

will probably wear out before the cylinder, and certain of them—probably those in proximity to the source of heat—will fail sooner than others. But it was not the design of the inventor that their life should be brief, or that they should fail during a time largely disproportioned to the life of the cylinder. The same influences causing deterioration act, even if they act unequally, on the cylinder and tubes; but it cannot be said, as in Wilson v. Simpson, that the arrangement of the tubes, and the functions imposed upon them, contemplated frequent consumption and replacement.

In Gottfried v. Conrad Seipp Brewing Co. (C. C.) 8 Fed. 322, the bill was dismissed for noninfringement; but Judge Blodgett held that the grates, pipes, and blowers were worn out, and their renewal by the defendant did not destroy the identity of the machine. The opinion states:

"If, for instance, this patent had been upon a peculiar grate, and there had been no patent upon the other parts of the machine, when the grate was worn out the defendant would have no right to put in another like it, because the grate was covered by the patent; but, if the grate is only a part of the entire combination, I think it has a right to replace the worn-out parts, and it cannot be said to be a different machine."

The first claim of the patent was held invalid in Crescent Brewing Co. v. Gottfried, 128 U. S. 158, 9 Sup. Ct. 83, 32 L. Ed. 390; but, upon the assumption of validity, some of the parts held by Judge Blodgett to have been renewed without infringement were mentioned in the claim. The invention related to the preparation of casks for receiving pitch or other melted substance, by subjecting the interior of such casks to blasts of highly heated air by means of an apparatus described in the letters. There were three claims:

"(1) The application of heated air under blast to the interior of casks by means substantially as described, and for the purposes set forth.

"(2) The use of a removable conductor, E, in combination with a furnace and blowing apparatus, arranged and operated substantially as described.

"(3) The tube-holding plate, i, in combination with the removable pipe, E, and blast furnace, A, substantially as and for the purposes described."

The opinion of the court (128 U. S. 166, 9 Sup. Ct. 85, 32 L. Ed. 390), describes the above structure as—

"An apparatus consisting of a fan-case arranged outside of a furnace, and furnished with a series of rotary wings or fans, which create a blast of air, and force such blast into a chamber and through a fire built upon a grate in the chamber, and thence through such chamber and out of it, and, by means of a pipe, into the cask which it is desired to heat; the heated products of combustion being thus forced into the cask, and then allowed to escape therefrom, so that the cask will be properly heated to admit of the ready flow of the melted pitch into the pores and cracks or joints in the wood in the interior of the cask when the cask is rolled about."

The grates that were renewed were not specific elements of the combination, but the removable conductor and the blowing apparatus were. The blowers that were replaced were probably the rotary wings or fans inside the fan-case, so that only a portion of the blowing apparatus was renewed. The conductor or pipe seemed to have patentable novelty only from the fact that it was removable, and it was said in the opinion of the Supreme Court, "It

is cast separate from the furnace, for convenience of renewal in case of the breakage of either it or the furnace." Indeed, the specification states that the pipe is removed when the cask has been subjected to treatment.

In Gottfried v. Schoenhofen, 10 Fed. Cas. 841, the infringement of the same patent was involved; and while it was held that the defendant was entitled to use the original structure, yet, as he had torn it down, removed the old parts, and put up another machine, consisting of parts of the original machine, he thereby so destroyed the parts of the original machine as to make him an infringer. It does not appear what parts were renewed.

In Cotton-Tie Company v. Simmons, 106 U. S. 89, 1 Sup. Ct. 52, 27 L. Ed. 79, the cotton-bale ties that were the subject of the patent consisted of a buckle and band, with the words, "Licensed to use once only," stamped in the metal of the buckle. At the cotton mill the band was cut, and the ties sold as scrap iron to H., who rolled out the pieces of the band, riveted their ends, cut them to proper lengths, and sold them with the old buckles for their original purpose. This was held to be a reconstruction of the tie. It will be observed that the right to use was, by the very license to use, subject to the necessity of destruction after one use, and that the device as such was actually destroyed. Hence when the ties came to the defendant they were, in fact and in law, incapable of restoration for the purpose of baling cotton.

Shickle, Harrison & Howard Iron Co. v. St. Louis Car Coupler Co., 77 Fed. 739, 23 C. C. A. 433, related to a patent for car couplers. The couplers consisted of:

"First, the drawheads or shanks; second, the coupling head or knuckle which is used to connect them; third, the pivot pin on which the knuckle turns; and, fourth, the locking pin."

Each claim of the patent was founded upon a combination of three or more of these elements, and no one of the elements was the subject of a separate claim. The defendant made and sold, to persons licensed to use the couplers, knuckles in substitution of those worn out or broken. Judge Thayer states in the opinion:

"The Circuit Court concluded that the manufacture and substitution of new knuckles for those which had been broken should be regarded as a reconstruction of the car coupler, rather than a repair. It was led to entertain this view, as it seems, because it regarded the knuckle as the chief element of the patented combination; also because the knuckle is unique in form and structure, and only susceptible of use in connection with the other elements of the complainant's device. St. Louis Car Coupler Co. v. Shickle, Harrison & Howard Co. (C. C.) 70 Fed. 783. It is undoubtedly true that the patentee did display considerable ingenuity in devising the peculiar shaped knuckle. It is also true that the knuckle is an important element of the coupling device in question, and that it is utterly useless except in combination with the drawheads forming the coupler. But we are not able to say for these reasons that the substitution of new knuckles for others that had been broken should be regarded as a reconstruction of the coupler. * * * Moreover, the drawheads of the coupling device, besides being more durable than the knuckle, are also an essential part of the patented combination. It is not wholly accurate to say that the knuckle is the chief element of the combination. The drawheads have an equally important function to perform. They are not like the drawheads in use in the ordinary

coupling device, but are of peculiar design; being so cast as to fit or complement the knuckle and render it operative. The drawheads are also much the larger part of the coupling device, and doubtless cost more than the knuckle. Neither can we say that the knuckle is the only part of the coupler which affords evidence of invention, for that is found in the conception of the coupler as a whole, and in the shape and arrangement of all its parts, including the drawheads."

In considering the relative durability of the parts it is said:

"Other considerations, we think, are entitled to greater weight. The knuckle or 'coupling-head,' as it is termed in the patent, is an irregular, hook-shaped piece of cast iron or steel, which is interposed between the drawheads or shanks of the car coupler, and is perforated with holes in which to insert the locking pin and pivot pin. Owing to its position between the drawheads, it frequently receives a severe blow or shock when, in the act of coupling, two cars come together, besides being subjected to a great strain when a train is started or is in motion. The proof shows that it is much more liable to be broken than other parts of the coupling device, and, from the peculiar shape of the knuckle, and its location between the drawheads, it seems obvious that the knuckle will be broken frequently, while the drawheads remain intact, and that the knuckle is therefore less durable than other parts of the coupler. * * * It can hardly be supposed that a railroad company would equip its cars with a patent coupling apparatus like the one in controversy, one part whereof is liable to be broken long before the drawheads are worn out, unless the purchase of the coupling apparatus was made on the implied understanding that the purchaser should have the right to replace that part of the apparatus, if it was accidentally broken, without being compelled to pay further tribute to the owner of the patent."

After referring to Wilson v. Simpson, 9 How. 109, 13 L. Ed. 66, Farrington v. Board, 4 Fish. Pat. Cas. 216, Fed. Cas. No. 4,687, and Gottfried v. Brewing Co. (C. C.) 8 Fed. 322, it is said:

"In our judgment, the principle which underlies these decisions is strictly applicable to the case at bar. The knuckle of the complainant's car coupler is shown to be less durable than the drawheads, but no more essential to the successful operation of the coupling apparatus."

It was held that, while the defendant could not sell the knuckles indiscriminately, it could sell them, for the purpose of repairing the patent coupling devices, to persons or corporations who had acquired the right to make use of them. This case holds that an essential element of a combination of peculiar design, although not the most essential element of the combination, and presumably less expensive than other equally essential parts, and purchased on an implied understanding that the purchaser should have a right to replace, may be replaced when worn out in use, and that such replacement is not reconstruction, but repair.

In Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 152 U. S. 425, 14 Sup. Ct. 627, 38 L. Ed. 500, it was held that letters patent for an apparatus for holding toilet paper were not infringed by selling such fixture or apparatus, bought of the patentee, with paper manufactured by the seller. As to two of the patents, the opinion states:

"Each patent contains five claims, and in all of them, except the fourth and fifth of the first patent and the fifth of the second, the paper roll is included as an element of the combination. No question is made but that the mechanism of these patents by which the paper is served out to the user involves a patentable novelty; but it is claimed, first, that the roll of paper

being perishable, and the machine being constructed for the purpose of delivering this paper to users in convenient lengths, such a roll is not a proper part of the combination; second, that, conceding it to be a part of the combination, there was no infringement. * * * The real question in this case is whether, conceding the combination of the oval roll with the fixture to be a valid combination, the sale of one element of such combination, with the intent that it shall be used with the other element, is an infringement. We are of opinion that it is not. There are doubtless 'many cases to the effect that the manufacture and sale of a single element of a combination, with intent that it shall be united to the other ·elements, and so complete the combination, is an infringement. Saxe v. Hammond, Holmes, 456, Fed. Cas. No. 12,411; Wallace v. Holmes, 9 Blatchf. 65, ·Fed. Cas. No. 17,100; Barnes v. Straus, 9 Blatchf. 553, Fed. Cas. No. 1,022; Schneider v. Pountney (C. C.) 21 Fed. 399. But we think these cases have no application to one where the element made by the alleged infringer is an article of manufacture perishable in its nature, which it is the object of the mechanism to deliver, and which must be renewed periodically whenever the device is put to use. Of course, if the product itself is the subject of a valid patent, it would be an infringement of that patent to purchase such product of another than the patentee; but, if the product be unpatentable, it is giving to the patentee of the machine the benefit of a patent upon the product, by requiring such product to be bought of him. To repeat an illustration already put: If a log were an element of a patentable mechanism for sawing such log, it would, upon the construction claimed by the plaintiff, require the purchaser of the sawing device to buy his logs of the patentee of the mechanism, or subject himself to a charge of infringement. This exhibits not only the impossibility of this construction of the patent, but the difficulty of treating the paper as an element of the combination at all. In this view the distinction between repair and reconstruction becomes of no value, since the renewal of the paper is, in a proper sense, neither the one nor the other."

The opinion states that the case is more nearly analogous to the planing machine case in Wilson v. Simpson, and distinguishes it from Aiken v. Manchester Printworks, where the needles were the subject of a separate patent, and adds:

"As we have already held that the paper roll in this case was not the subject of a valid patent, it follows that the defendants cannot be held as infringers for the manufacture and sale of such roll."

In Farrington v. Board of Water Commissioners of the City of Detroit, 4 Fish. Pat. Cas. 216, Fed. Cas. No. 4,687, is involved "a new and 'improved machine, intended chiefly for boring pump logs," and the invention consisted in, "first, the employment or use of a tubular or hollow auger or bit," constructed and arranged as shown; and, "also, in the combination of the tubular or hollow auger or bit with a screw or worm-rod, arranged and operating" as described. The opinion states that it is clear that the patent covers—

"(1) The lips of the auger or bit, in question. (2) The combination of the hollow auger or bit with the new lips attached, with the screw or worm for removing the chips as fast as made, as described. (3) The 'lips' and the 'combination' are the only things that were new, or claimed as new, and, of course, were the only things patented. The 'combination' included the 'lips,' and it is the combination, together with the ordinary machinery for giving its different parts the requisite motion, that constitutes the 'machine,' as a whole, which is mentioned in the first sentence of the specifications above quoted, which was covered by the patent, which was sold to the defendants, and which they had the right to use. In this combination the lips of the auger or bit constitute the effective element, but the inventor has so arranged them in the combination that the machine · could not be continued in use without a complete renewal of them at short intervals. From the nature of

the case, these lips could be but temporary in their relation to the use of the whole machine, and it must have been so understood by the inventor in selling, and the purchaser in buying, the machine."

The evidence showed that the lips of the auger or bit would wear out in about 40 days, and, unless replaced by new ones, the machine could not be longer used, and that it was the replacing of such old, worn-out lips by new ones that constituted the alleged infringement. For convenience in taking off and putting on the lips of the auger or bit for the purpose of sharpening or repair, the auger or bit was so constructed that a small portion of the outer end of it, to which the lips were attached, could be screwed off and on at pleasure, and thereby the new lips attached in place of the old ones, although such device for taking off and putting on the new lips was no part of the invention. It was held that the case was analogous to Wilson v. Simpson, and that the fact that in that case the cutter knives were not a part of the invention did not distinguish it. It was stated, "The only question is, are they [the lips], from the nature of things, temporary in their relation to the use of the whole combination?" It was held that the defendant did not infringe.

The decision in Goodyear Shoe Machinery Co. v. Jackson, 112 Fed. 146, decided by the Circuit Court of Appeals, First Circuit, in 1901, is instructive not only in the careful discussion and presentation of principles, but in their application to the case then at bar. The opinion states:

"Each of the purchasers in the suit at bar bought from the Lincoln Sewing Machine Company, who then owned the patents in issue, machines called the 'Lincoln Machine'—an in-seam sewing machine designed to unite the sole and upper of a turned shoe, or the sole and welt of a welt shoe. There are always found in such a machine a needle, a looper, and a tension for forming the stitch, and their actuating mechanism; guiding devices for guiding the work, and their actuating mechanism; and feeding devices for feeding the work, and their actuating mechanism."

As to one of the patents involved, the charge of infringement was that the purchaser, "in repairing his machine, replaced in the feeding device the cam which, with its connections, gives the vertical movement to the needle."

The opinion states:

"It is manifest, however, that a broken or worn-out cam effected only a partial destruction of the patented combination, composed of three separate groups of mechanism, and that the replacement of the old cam with a new one was not a substantial rebuilding of the combination. If the patented invention had been for this particular form of cam, or had been simply for an improved feed, and the whole invention had resided substantially in the cam, the case would have presented a different aspect."

It was held that the replacement of the cam was not infringement.

A second patent was for "a new and useful welt guide mechanism for sewing machines." As to this the court said:

"Here, again, we have a combination patent embracing a number of essential elements. The purchaser of a Lincoln machine bought the whole of this combined mechanism, and was entitled to use it until its usefulness had

ceased by reason of decay or destruction. The charge of infringement of this claim is substantially limited to the replacement of the cam which moves the carrier to and from the curved needle. But this cam is only one of the material elements of the patented combination, and, further, it only moves the carrier back and forth in a straight line, and is not productive of the curved movement of the welt guide, which is the essential feature ·of this invention. As for the carrier of the welt guide, which it is also said the purchaser replaced, this, again, is only one of the elements of the combination. On the whole, we fail to find in these repairs anything like a substantial rebuilding of the patented combination."

The third patent was for a new and useful improvement "in means for providing slack thread" in the class of sewing machines under consideration. The patentees state their invention as follows:

" 'What we claim as our invention is: In a chain stitch, hook-needle sewing machine, the combination of tension, looper, hook needle, a pull-off mechanism between the needle and the tension, and actuating mechanism timed to cause the pull-off mechanism to make its pulling stroke, after the hook needle has completed its loop-drawing stroke, ·and while the loop is held under strain by the hook of the needle, substantially· as described.' There was sold to the purchaser of a Lincoln machine this patented combination, and he had the right to prolong its life and usefulness by any repairs, which fell short of a reconstruction of substantially the whole combination. It cannot be said, therefore, that the replacement by the purchaser of the cam or the pull-off lever which moves the pull-off truck constituted an infringement of the patent, although it may be this cam was the characteristic and most essential element in the combination. The breaking or wearing out of this cam resulted in only a partial destruction of the patented combination, and its replacement by a new cam was plainly a restoration, and not a substantial reconstruction of the combination."

The above.decisions show that a needle subject to a separate patent cannot be replaced by the purchaser; that a cutting part of a patented combination, consumed by use within a few months, may be restored; that a device that regulates the delivery for consumption of an article also combined in the claim is not infringed by the person who supplies such article; that, when the patented article consists of a band and buckle, a person cannot gather fragments of many such articles, each severed after use, and piece the parts, cut to usable lengths, restore the buckles, and sell the product for the original purpose, because the act is no different from taking a confused heap of old parts of a patented article, and, after patching and mending, reassembling the parts. Even the parts reassembled may not have been previously related. Thus far there is not serious difficulty.

But Judge Colt held that parts of a sewing machine, some subject to a separate claim and some in combination, could not be replaced by the purchaser; and later the learned judge, in the Circuit Court of· Appeals, considered that a cam-actuating mechanism used in a sewing machine, even when the "characteristic and most essential" element in the combination, could be replaced by the purchaser. So the Circuit Court of Appeals in the Second Circuit held that a trolley stand—an element, but not the vital element, of the patent—could be replaced, but disclaims holding that a vital element could be replaced. It will be observed that no court has held that

the purchaser could replace the sole vital element of the combination. The knuckles in the car coupler were held to have been replaced lawfully, although an important, but not the most important, part of the combination; and even then the decision rested upon the ground of such greater exposure to breakage, as compared with the other parts, as justified implied authority to renew. But the filament in the Edison burner was held to be the vital element in the combination, not replaceable by the purchaser. Its very use, barring accident, made it the sole item of consumption in the patent; but, as it was the only justification for the patent, it stood as if it were the subject of a separate claim. When it perished the whole combination lost life and identity.

An attempted generalization of the cases is as follows: An element of a patented combination may be replaced by the purchaser, of his own authority, (1) when its consumption was the very purpose of the device; (2) when its use upon external objects must work its early destruction; (3) when it was intended to be destroyed and was destroyed after a single use, and became waste material; (4) when, in the arrangement of an element, not the chief element, it is so fashioned and placed as to be specially subjected to external forces that make it peculiarly liable to breakage and wear, like the knuckle in the car coupler; (5) when it is not the chief part of the combination, like the trolley stand; (6) when it is an ordinary working part, like the cam in actuating machinery, although specially adapted for the proper operation of the device, and the decision is broad enough to cover a cam which is the most essential element in a combination. But a part of a combination may not be replaced by the purchaser when it is the vital element of the combination, in fact, and in regard to patentability, especially when it is not intended to be of short life by the action of external forces thereon. The generalization is probably imperfect, but it is considered that the spirit of the law, as expressed in the decisions, is at least that a part that gives sole patentability to the combination may not be replaced by a purchaser without the patentee's consent. Cases may arise where, from inability or unreasonable refusal, the patentee fails to supply the vital part, and where, from the nature of the machine and its uses, it would be inferable that the patentee and his grantee contemplated that a broken or injured part should be supplied, to enable the machine, as a whole, to be used through the life of the whole. In such case a court of equity should permit the purchaser to have the use contemplated by the parties, and if the patentee failed, neglected, or unreasonably refused to provide the part become worthless, the court would not restrain the purchaser from supplying it. But in the suit at bar the patentee's licensee to manufacture had offered to supply the parts upon reasonable terms, and those parts are the very vital parts of the machine, and, in addition, are not parts of such brief duration, in the ordinary use of the machine relatively to the other parts, that it can be fairly held that the parties intended that such parts might be furnished by the grantee. Of

138 F.—6

course, the question is not free from difficulty; otherwise this extended discussion would not have been necessary. The conclusion is reached that the defendant was not permitted to replace the tubes in the Terre Haute & American Company's boilers. But suppose that one tube fails in use! May the defendant supply it? If he may supply one, how many more may he supply before he reaches the point of infringement? For instance, in the present case, when the Wurster boiler was dismantled, the defendant supplied 4 out of 19 tiers. The evidence seems to indicate that it would have supplied more, had it not been enjoined. Was that infringement? It seems illogical to hold that the defendant may not supply the whole 19 tiers, but may provide 4 tiers; that is, that it may carry on the business of supplying tubes, provided it keeps within certain limits. The supply was not for an emergency. It is not as if a tube or a few tubes had broken, and in an exigency the purchaser applied to a local mechanic to supply them. What would be equitable in such an instance need not be determined, for here the defendant has entered the business for the general purpose of supplying tubes, few or many, and should be enjoined from such general business. Its whole attitude is that of a trespasser.

Hence the complainant should have a decree against the defendant, enjoining it from supplying tubes for use in the patented generating cylinder.